E-FILED
Friday, 12 October, 2012  02:56:25 PM
Clerk, U.S. District Court, ILCD

United States Courts
Southern District of Texas
FILED

UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF TEXAS

DEC 2 0 2006

Michael N. Milby, Clerk

---

UNITED STATES *ex rel.*
  BUD CONYERS,

    Qui Tam Plaintiff,

    v.

HALLIBURTON CO.,
KELLOGG BROWN & ROOT, INC., and
KELLOGG BROWN AND ROOT
  SERVICES, INC.

    Defendants.

Filed *in camera* and under seal
pursuant to 31 U.S.C. § 3730

**H-06-4024**

Civ. No. _____
12-4095

**Sealed**
Public and unofficial staff access
to this instrument are
prohibited by court order.

## COMPLAINT

1.    This is an action under the False Claims Act ("FCA"), 31 U.S.C. § 3729-32 (2000), regarding the Defendants' submission of false claims to the U.S. Army (the "Army"). The Defendants received an Army contract to provide troop support in Iraq (the "LogCAP Contract," or "LogCAP"). Among other things, they:

- used morgue trucks that contained decayed human remains to store and transport ice to U.S. soldiers (ice which was used in refreshments);

- took kickbacks from vehicle suppliers; and

- hired prostitutes as staff, and billed the expense to the Army.

2.    Qui Tam Plaintiff Bud Conyers was a civilian truck driver working under

the LogCAP Contract. He has direct and independent knowledge of the information on which these allegations are based. Defendants' actions grossly violated the terms of the LogCAP Contract, and other applicable law. They nevertheless certified to the Army, with their payment requests and otherwise, that they had performed their contract requirements properly. These claims for payment to the Army thus were false and fraudulent. The Qui Tam Plaintiff complained to Defendants repeatedly about their failure to abide by health and safety standards, in particular regarding transporting, in morgue trucks, ice that was consumed by the troops. Conyers suffered in the terms and conditions of his employment as a result of his investigation of this fraud. The Defendants harassed him, stopped paying him, and then terminated his employment.

## PARTIES

3.    Qui Tam Plaintiff Bud Conyers ("Conyers") is a citizen of the United States, now domiciled in Enid, Oklahoma. He served in the U.S. Army from 1987 to 1989, and then went to school on the G.I. Bill. He drove trucks from 1994 until 2005. Hoping to help the war effort in Iraq, he joined Defendants in 2003 as a truck driver and convoy commander. His address is 2318 N. Washington, Enid, Oklahoma 73701.

4.    Defendant Halliburton Company ("Halliburton") is a publicly-traded company incorporated in Delaware. It wholly owns all business entities known as Kellogg Brown and Root or KBR, and did so before, during and after their reorganization under Chapter 11. Halliburton's principal places of business are Suite 200, 1150 18th St.,

2

N.W., Washington, D.C. 20036 and 5 Houston Center, 1401 McKinney, Houston, Texas 77010.

5. Defendant Kellogg Brown & Root, Inc. ("KBR Inc.") and Defendant Kellogg, Brown & Root Services, Inc. ("KBR Services") are contractors under the LogCAP Contract, as explained further below. Their address is 5 Houston Center, 1401 McKinney, Houston, Texas 77010. KBR Inc. and KBR Services employ approximately 60% of Halliburton's total staff.

Collectively, Halliburton, KBR Inc. and KBR Services are referred to as the Defendants. Together, KBR Inc. and KBR Services are referred to as KBR.

## JURISDICTION AND VENUE

6. This action arises under 31 U.S.C. § 3729 *et seq.* Therefore, this is a case or controversy arising under the laws of the United States. Hence there is subject matter jurisdiction under 28 U.S.C. § 1331 (2000).

7. This action may be brought in this judicial district under 31 U.S.C. § 3732(a) (2000) because, *inter alia,* one or more of the Defendants can be found or transacts business in this judicial district, and one or more of the acts prescribed by *id.* § 3729 occurred in this judicial district.

## ALLEGATIONS

8.    In 2001, the U.S. Army Corps of Engineers awarded a 10-year contract to KBR under the U.S. Army's Logistics Civil Augmentation Program. This is the LogCAP Contract.

9.    The U.S. Army Field Support Command ("FSC") administers the LogCAP contract. FSC is headquartered in Rock Island, IL. FSC's address is 1 Rock Island Arsenal, Rock Island, IL 61229-6000.

10.    LogCAP is Contract No. DAAA09-02-D-0007. ("DAAA09" is a prefix referring to the FSC office in Rock Island.) LogCAP is a 10-year Task Order contract that calls for the contractor to provide a wide range of logistical services to the U.S. Army, including billeting, food, power, waste management, transport, and water and ice.

11.    On information and belief, LogCAP was awarded to Kellogg Brown & Root Services, then an unincorporated division of Defendant KBR Inc., and later transferred to Defendant KBR Services.

12.    Defendants KBR Inc. and KBR Services have submitted LogCAP claims to U.S. Government employees at FSC (and other locations) that FSC received within this judicial district. Defendant Halliburton caused such claims to be submitted. For the reasons stated above and below, these claims were false and fraudulent.

13.    In 2003, Qui Tam Plaintiff Bud Conyers went to work in Kuwait and Iraq for KBR, so that he could earn money for his family, and help his country in the war effort.

4

14.    Conyers worked for KBR's Theater Transportation Mission, which provides transportation in support of the U.S. forces in Kuwait and Iraq. He worked as a truck driver and convoy commander. Despite exhaustive searches, Relator does not have access to the Task Orders that are part of the Theater Transportation Mission because they are in the exclusive possession and control of Defendants.

I.    **Ice Consumed by U.S. Troops Delivered in Morgue Trailers**

15.    In March 2003, soldiers from the U.S. Army's 54th Quartermaster Company (the "54th"), of Fort Lee, VA, comprised the Army's only active duty Mortuary Affairs unit. That month, when the U.S. occupation of Iraq began, the 54th deployed to Kuwait, Iraq and Afghanistan.

16.    When the 54th arrived in the combat theater, two teams branched off to support combat divisions heading toward Baghdad, Iraq. Both teams also established temporary internment cemeteries for deceased Iraqis.

17.    After U.S. forces occupied Baghdad in April 2003, the teams from the 54th remained in the area. They assisted in the recovery of human remains from battle.

18.    The teams from the 54th employed refrigerated trailers to transport remains to burial sites. Refrigerated vehicles, whether for this purpose or for other purposes, were known as "reefers."

5

19.    The proper disposal of human remains is a very serious matter, not only for cultural and religious reasons, but also for reasons of health and safety. According to the U.S. Army Center for Health Promotion and Preventive Medicine's Technical Guide:

> Contact with whole or part human remains carries potential risks associated with pathogenic microbiological organisms that may be present in human blood and tissue. Infectious conditions and pathogens in the recently deceased include –
>
> □ bloodborne pathogens such as hepatitis B virus (HBV), hepatitis C Virus (HCV), hepatitis D virus (HDV), hepatitis E virus (HEV) and human immunodeficiency virus (HIV);
> □ tuberculosis;
> □ group A streptococcal infection;
> □ gastrointestinal organisms;
> □ agents that cause transmissible spongiform encephalopathies such as Creutz Jakob disease; and
> □ possibly meningitis and septicemia (especially meningococcal).
> * * *
> The primary ways to protect personnel who handle human remains against infectious diseases are –
> □ use of appropriate personal protective equipment,
> □ observance of safety, industrial hygiene, and infection control practices described in this TG [Technical Guide].

"Guidelines for Protecting Mortuary Affairs Personnel from Potentially Infectious Material," TG 195 (October 2001).

20.    According to U.S. Federal Motor Carrier Safety Regulations, once a trailer is used to transport human remains, it can never be used for other purposes. The Army has adopted this rule.

21.    The Army and the U.S. Department of Defense have promulgated numerous rules regarding health and safety. Many of these rules were incorporated in the LogCAP Contract, and were binding on the Defendants. Under these health and safety

rules, the Defendants were not permitted to use mortuary trailers that had transported human remains to deliver supplies to U.S. troops. This included trailers that the teams from the 54th had employed.

22. Halliburton's "Code of Business Conduct: Health, Safety and Environment," – which the Board of Directors approved on May 21, 2003, and which explicitly applies to KBR – states:

> The Company will comply with all applicable Laws and relevant industry standards of practice concerning protection of health and safety of its Employees . . . Protection of health [and] safety . . . is a primary goal of the Company and the management of the Company shall take such actions as are reasonable and necessary to achieve such goal and carry out this Policy.

23. The Defendants disregarded applicable health and safety rules by hiring and using mortuary trailers to deliver supplies to U.S. troops, and submitting claims under the LogCAP Contract for the cost of such to the Army. As a result, those claims were false and fraudulent.

24. In addition, the Defendants followed none of the Army rules regarding the protection of personnel exposed to human remains. Nor did KBR follow Army rules governing the disinfection of vehicles or equipment containing such remains.

25. Conyers discovered the Defendants' misuse of mortuary trailers in a particularly unpleasant manner. On or about June 16, 2003, while working under the LogCAP Contract, Conyers assisted LogCAP convoy commander Wallace Wynia, David Milk and a half-dozen other LogCAP drivers in the repair of the engine of a truck –

7

"reefer" [refrigerated] Trailer R-89 – that had been inoperative for two weeks.

26.     After about six hours of work, Conyers and the others got the engine running.  They then wanted to check the trailer, to make sure the cooling unit worked. They opened the trailer door to a gruesome discovery.  Inside, they found 15 dead Iraqis in various stages of decomposition, as well as body parts and unidentifiable human matter on the floor.  The bodies had been rotting in heat in excess of 120°, for approximately two weeks.

27.     Since this vehicle was a morgue trailer, the Defendants were supposed to send it to an Army base in Kuwait, for continued use as such.  Instead, the morgue trailer went to a Public Warehousing Company ("PWC") facility, for use by the Defendants under the LogCAP contract – specifically, to deliver ice to U.S. troops.

28.     As noted above, under the LogCAP contract, KBR delivers various supplies to Army bases and other U.S. facilities in Iraq.  Among these supplies is ice made from drinking water.  U.S. troops in Iraq consume such ice in large quantities, to cool beverages.  KBR uses "reefer" vehicles to keep this ice frozen as it is delivered to U.S. facilities in Iraq.  This is sometimes referred to as "potable ice" or "edible ice," although of course it is no longer potable or edible after being transported in a morgue trailer.

29.     In the case of Trailer R-89, an Army mortuary team unloaded the Iraqi bodies at the PWC facility.  A KBR foreman ordered Trailer R-89 to an "ice center," where it was loaded with "potable" ice.  Trailer R-89 then delivered that ice for consumption by U.S. soldiers.  After this run, KBR kept the contaminated trailer in

8

circulation for various cargo, including more "potable" ice.

30.    KBR's Project Manager and Deputy Project Manager covered up the Trailer R-89 incident. Earlier, two KBR employees had been injured while joy-riding a Blackhawk helicopter. Wynia and convoy commander Jeff Allen did not want those employees fired, and wanted KBR to pay the employees (at taxpayer expense) during their recovery. On information and belief, Wynia and Allan made a deal with two KBR supervisors, Ely and Ducksbury, that they would not tell anyone about KBR's practice of transporting "potable" ice on morgue trucks if KBR would retain and pay those two injured employees during their recovery. Conyers overheard Ely and Wynia discussing this deal when Conyers and other witnesses to the Trailer R-89 incident were called to Wynia's office.

31.    The Trailer R-89 incident was far from isolated. Conyers tried to stop the Defendants and their suppliers from loading "potable" ice onto morgue trucks at least six times after the grisly June 2003 incident.

32.    More than two months after the initial incident, as reported in Allen's August 31 mission log, Trailer R-89 was still being used to transport "potable" ice. Of the 5,000 pounds loaded onto the trailer, "approx. 1,800 pounds" of the "bio-contaminated ice" was used, according to a signed note written in a log.

33.    Conyers repeatedly filed complaints with KBR's Internal Affairs Office, but the awful practice continued. Conyers and a colleague even took pictures to

9

substantiate what was happening. Conyers' boss found out, got angry with Conyers, and confiscated the pictures (but not the negatives).

34.    The claims that the Defendants submitted under the LogCAP contract for the transportation of items in refrigerated vehicles were false or fraudulent, because the Defendants certified compliance with applicable rules and contract provisions, but (*inter alia*) KBR did not comply with the rules forbidding the use of mortuary trucks to deliver other items, the rules governing the protection of persons exposed to human remains, and the rules governing cleaning and cleanliness of vehicles and equipment.

## II.    Kickbacks on Trucks

35.    One of Conyers' first bosses, Willie Dawson, took kickbacks from leasing companies for trucks, trailers and equipment. To add insult to injury, Dawson was taking the kickbacks regardless of whether these items worked.

36.    For example, KBR has a fleet of around 200 "reefer" trailers to transport food and ice, but only around 50 ever worked. KBR submitted claims to the Army for all 200, however, so that Dawson and others could receive their kickbacks on all 200.

37.    This resulted in false and fraudulent claims to the Government, for several reasons. *Inter alia*, the cost of the kickback was incorporated in the leasing company's bill to KBR, and KBR's bill to the Government. In addition, because of the billing for the inoperative vehicles, the leasing companies billed approximately four times as much as the bill would have been for operative vehicles, and this, in turn, increased KBR's bill

to the Government.  Moreover, this arrangement caused unnecessary repair bills to be submitted to the Government.  Furthermore, the resulting inefficiency meant that the overall cost of the mission was increased.

38.    Conyers complained to his immediate foreman and then to the local leasing company about these kickbacks.  The local leasing company manager offered Conyers the same deal that Conyers' KBR supervisor was getting: "a kickback on all equipment that hits the ground, good or bad."

39.    Conyers rejected the bribe.

40.    Rob Nuble was another KBR employee taking kickbacks of this kind.  At Camp Anaconda, Nuble took kickbacks from the supplier of flatbed trucks billed for use there.  Nuble came up with a new twist -- he charged the Army for more trucks than were really delivered to Camp Anaconda, and took kickbacks on the phantom trucks.  Nuble actually bragged about this to Conyers.

41.    Conyers filed complaints about the kickbacks with KBR's Internal Affairs Office.  Nothing changed.

## III.    Prostitution Billed to the U.S. Government

42.    Conyers initially was assigned to work for KBR in Kuwait.  In Kuwait, Conyers observed that women from Bosnia and Kosovo who worked for KBR served as prostitutes for male KBR managers.  Conyers learned that the managers had hired these

women as LogCAP employees, billing their salaries to the Army under the LogCAP Contract. The women did little if any actual work under LogCAP, however. Their primary function was simply to service the KBR managers. KBR even paid for their hotel rooms. Conyers reported this to KBR's Internal Affairs Office, again to no effect.

43. Needless to say, providing prostitution services to KBR management is not authorized under the LogCAP Contract. The employment of prostitutes, at taxpayer expense, inflated the bills that the Defendants submitted under the LogCAP Contract to U.S. Government employees.

## IV. Retaliation

44. Despite threats from his supervisor, Conyers repeatedly filed complaints to KBR's Internal Affairs Office.

45. On October 24, 2003, Conyers told Jim Coin, KBR's Employee Relations Manager for LogCAP, about yet another morgue trailer having a dead body in it (this one at Cedar II). Conyers was relieved of his LogCAP duties the next day.

46. KBR stopped paying Conyers. In fact, he did not receive any of his salary after August 2003. When he complained to a supervisor, he was told that this is what happens when you are not a "team player."

47. KBR did not reimburse Conyers for the $4000 replacement prosthesis that Conyers had to buy when his artificial leg was broken on the job in Iraq. He also lost all of his personal belongings in Camp Anaconda, including his clothes, his replacement

12

artificial leg, and holiday presents for his family.

48.    KBR fired him on December 28, 2003, ostensibly for "failure to remain at his post" in Safir al-Dana.

49.    Conyers reported the incidents to the Army's Criminal Investigative Division in Kuwait.

## First Claim - FALSE CLAIMS (FCA § 3729(a)(1))

50.    All of the preceding allegations are incorporated herein.

51.    KBR has billed the Government under the LogCAP Contract each month, and will continue to do so during the pendency of this lawsuit. Each of these LogCAP claims relating to the shipping of edible ice in morgue trailers, taking kickbacks on trucks and billing for more working trucks than there were, and billing prostitutes as personnel, beginning no later than 2003 and continuing during the pendency of this lawsuit, is a false or fraudulent claim, for the reasons alleged above. On information and belief, all of these false claims were presented for payment or approval to employees of the U.S. Government. KBR did so with actual knowledge of the falsity of each claim, reckless disregard for the truth and falsity of each claim, and deliberate indifference.

52.    Halliburton caused such false and fraudulent claims to be submitted, for the reasons alleged above.

53.    Defendants thus knowingly presented, or caused to be presented, to an officer or employee of the United States Government or a member of the Armed Forces

13

of the United States, false or fraudulent claims for payment or approval. Defendants knowingly made false representations in order to obtain a benefit that they did not provide.

## Second Claim - FALSE STATEMENTS (FCA § 3729(a)(2))

54. All of the preceding allegations are incorporated herein.

55. The Defendants knowingly made, used or caused to be made or used numerous false records or statements to get the false or fraudulent claims paid or approved. For instance, Defendants made false statements regarding the source of reefer trailers, the actual cost of reefer trailers, and the number of reefer trailers in use.

56. The Defendants thus knowingly made, used, or caused to be made or used, false records or statements to get false or fraudulent claims paid or approved by the Government. Defendants knowingly made, used or caused to made or used, such false records or statements in order to obtain a benefit that they did not provide.

WHEREFORE, for each of the first two claims, the Qui Tam Plaintiff requests the following relief from the Defendants:

A. Three times the amount of damages that the Government sustains because of the acts of the Defendant;

B. A civil penalty of $11,000 for each violation;

C. An award to the Qui Tam Plaintiff for collecting the civil penalties and damages;

14

D.    Award of an amount for reasonable expenses necessarily incurred;

E.    Award of the Qui Tam Plaintiff's reasonable attorneys' fees and costs;

F.    Interest; and

G.    Such further relief as the Court deems just.


## Third Claim – RETALIATION (FCA § 3730(h))

57.    All of the preceding allegations are incorporated herein.

58.    For the reasons alleged above, the Qui Tam Plaintiff was an employee discharged, suspended, threatened, harassed, and in other manners discriminated against in the terms and conditions of employment by his employer because of lawful acts done by the employee on behalf of the employee or others in furtherance of a False Claims Act. This included his investigation for this action.

WHEREFORE, for this claim, the Qui Tam Plaintiff requests the following relief from each of the Defendants, jointly and severally:

A.    All relief necessary to make the Qui Tam Plaintiff whole;

B.    An order providing for reinstatement with the same seniority status that the Qui Tam Plaintiff would have had but for the discrimination, or in the alternative, front pay;

C.    Two times the amount of back pay and front pay;

D.    Interest on the back pay and front pay;

E.  Compensation for special damages sustained as a result of the discrimination, including but not limited to litigation costs and reasonable attorneys fees;

F.  Pre-judgment and post-judgment interest; and

G.  Such further relief as the Court deems just.

## Fourth Claim – BREACH OF CONTRACT

59.  All of the preceding allegations are incorporated herein.

60.  KBR entered into an employment contract with Conyers. There was adequate consideration for the contract.

61.  Conyers performed under the contract.

62.  KBR breached the employment contract by terminating it prematurely.

63.  KBR's actions were without lawful cause or justification.

64.  KBR's breach of the contract caused and continues to cause Conyers harm, *i.e.*, loss of the money due to him under his employment contract.

WHEREFORE, for this claim, the Qui Tam Plaintiff requests the following relief from each of the Defendants, jointly and severally:

A.  All relief necessary to make the Qui Tam Plaintiff whole;

B.  An order providing for reinstatement with the same seniority status that the Qui Tam Plaintiff would have had but for the discrimination, or in the alternative, front pay;

16

C.    Back pay;

D.    Interest on the back pay and front pay;

E.    Pre-judgment and post-judgment interest; and

F.    Such further relief as the Court deems just.


## JURY REQUEST

The Qui Tam Plaintiff requests a jury for all issues that may be tried by a jury.

Respectfully submitted,

HILDER & ASSOCIATES, P.C.

By_____

／ Philip H. Hilder
State Bar No. 09620050
819 Lovett Blvd.
Houston, Texas 77006-3905
Telephone (713) 655-9111
Facsimile (713) 655-9112

OF COUNSEL
Alan M. Grayson, Esq.
Grayson & Kubli, P.C.
1420 Spring Hill Rd., Suite 230
McLean, VA 22102
(703) 749-0000

Attorneys for Qui Tam Plaintiff
Bud Conyers

JS 44 (Rev. 11/04)

# CIVIL COVER SHEET

The JS 44 civil cover sheet and the information contained herein neither replace nor supplement the filing and service of pleadings or other papers as required by law, except as provided by local rules of court. This form, approved by the Judicial Conference of the United States in September 1974, is required for the use of the Clerk of Court for the purpose of initiating the civil docket sheet. (SEE INSTRUCTIONS ON THE REVERSE OF THE FORM.)

**Sealed**

## I. (a) PLAINTIFFS

United States ex rel.
Bud Conyers

**DEFENDANTS**

Public and unofficial disclosures to this instrument are prohibited by court order. United States Courts Southern District of Texas FILED

Halliburton Co., Kellogg Brown & Root, Inc.

(b) County of Residence of First Listed Plaintiff   U.S.
(EXCEPT IN U.S. PLAINTIFF CASES)

County of Residence of First Listed Defendant _____
(IN U.S. PLAINTIFF CASES ONLY)

DEC 2 0 2006

NOTE: IN LAND CONDEMNATION CASES, USE THE LOCATION OF THE LAND INVOLVED.

(c) Attorney's (Firm Name, Address, and Telephone Number)
Phil Hilder
Alan Grayson

Michael N. Milby, Clerk

# H-06-4024

## II. BASIS OF JURISDICTION (Place an "X" in One Box Only)

| | |
|---|---|
| XX 1 U.S. Government Plaintiff | ☐ 3 Federal Question (U.S. Government Not a Party) |
| ☐ 2 U.S. Government Defendant | ☐ 4 Diversity (Indicate Citizenship of Parties in Item III) |

## III. CITIZENSHIP OF PRINCIPAL PARTIES (Place an "X" in One Box for Plaintiff and One Box for Defendant)
(For Diversity Cases Only)

| | PTF | DEF | | PTF | DEF |
|---|---|---|---|---|---|
| Citizen of This State | ☐ 1 | ☐ 1 | Incorporated or Principal Place of Business In This State | ☐ 4 | XX 4 |
| Citizen of Another State | x☐ 2 | ☐ 2 | Incorporated and Principal Place of Business In Another State | ☐ 5 | ☐ 5 |
| Citizen or Subject of a Foreign Country | ☐ 3 | ☐ 3 | Foreign Nation | ☐ 6 | ☐ 6 |

## IV. NATURE OF SUIT (Place an "X" in One Box Only)

| CONTRACT | TORTS | | FORFEITURE/PENALTY | BANKRUPTCY | OTHER STATUTES |
|---|---|---|---|---|---|
| ☐ 110 Insurance | **PERSONAL INJURY** | **PERSONAL INJURY** | ☐ 610 Agriculture | ☐ 422 Appeal 28 USC 158 | ☐ 400 State Reapportionment |
| ☐ 120 Marine | ☐ 310 Airplane | ☐ 362 Personal Injury - Med. Malpractice | ☐ 620 Other Food & Drug | ☐ 423 Withdrawal 28 USC 157 | ☐ 410 Antitrust |
| ☐ 130 Miller Act | ☐ 315 Airplane Product Liability | ☐ 365 Personal Injury - Product Liability | ☐ 625 Drug Related Seizure of Property 21 USC 881 | | ☐ 430 Banks and Banking |
| ☐ 140 Negotiable Instrument | ☐ 320 Assault, Libel & Slander | ☐ 368 Asbestos Personal Injury Product Liability | ☐ 630 Liquor Laws | **PROPERTY RIGHTS** | ☐ 450 Commerce |
| ☐ 150 Recovery of Overpayment & Enforcement of Judgment | ☐ 330 Federal Employers' Liability | | ☐ 640 R.R. & Truck | ☐ 820 Copyrights | ☐ 460 Deportation |
| ☐ 151 Medicare Act | ☐ 340 Marine | **PERSONAL PROPERTY** | ☐ 650 Airline Regs. | ☐ 830 Patent | ☐ 470 Racketeer Influenced and Corrupt Organizations |
| ☐ 152 Recovery of Defaulted Student Loans (Excl. Veterans) | ☐ 345 Marine Product Liability | ☐ 370 Other Fraud | ☐ 660 Occupational Safety/Health | ☐ 840 Trademark | ☐ 480 Consumer Credit |
| ☐ 153 Recovery of Overpayment of Veteran's Benefits | ☐ 350 Motor Vehicle | ☐ 371 Truth in Lending | ☐ 690 Other | **LABOR** | ☐ 490 Cable/Sat TV |
| ☐ 160 Stockholders' Suits | ☐ 355 Motor Vehicle Product Liability | ☐ 380 Other Personal Property Damage | ☐ 710 Fair Labor Standards Act | **SOCIAL SECURITY** | ☐ 810 Selective Service |
| ☐ 190 Other Contract | ☐ 360 Other Personal Injury | ☐ 385 Property Damage Product Liability | ☐ 720 Labor/Mgmt. Relations | ☐ 861 HIA (1395ff) | ☐ 850 Securities/Commodities/ Exchange |
| ☐ 195 Contract Product Liability | | | ☐ 730 Labor/Mgmt.Reporting & Disclosure Act | ☐ 862 Black Lung (923) | ☐ 875 Customer Challenge 12 USC 3410 |
| ☐ 196 Franchise | **CIVIL RIGHTS** | **PRISONER PETITIONS** | ☐ 740 Railway Labor Act | ☐ 863 DIWC/DIWW (405(g)) | ☒ 890 Other Statutory Actions |
| **REAL PROPERTY** | ☐ 441 Voting | ☐ 510 Motions to Vacate Sentence | ☐ 790 Other Labor Litigation | ☐ 864 SSID Title XVI | ☐ 891 Agricultural Acts |
| ☐ 210 Land Condemnation | ☐ 442 Employment | Habeas Corpus: | ☐ 791 Empl. Ret. Inc. Security Act | ☐ 865 RSI (405(g)) | ☐ 892 Economic Stabilization Act |
| ☐ 220 Foreclosure | ☐ 443 Housing/ Accommodations | ☐ 530 General | | **FEDERAL TAX SUITS** | ☐ 893 Environmental Matters |
| ☐ 230 Rent Lease & Ejectment | ☐ 444 Welfare | ☐ 535 Death Penalty | | ☐ 870 Taxes (U.S. Plaintiff or Defendant) | ☐ 894 Energy Allocation Act |
| ☐ 240 Torts to Land | ☐ 445 Amer. w/Disabilities - Employment | ☐ 540 Mandamus & Other | | ☐ 871 IRS—Third Party 26 USC 7609 | ☐ 895 Freedom of Information Act |
| ☐ 245 Tort Product Liability | ☐ 446 Amer. w/Disabilities - Other | ☐ 550 Civil Rights | | | ☐ 900 Appeal of Fee Determination Under Equal Access to Justice |
| ☐ 290 All Other Real Property | ☐ 440 Other Civil Rights | ☐ 555 Prison Condition | | | ☐ 950 Constitutionality of State Statutes |

## V. ORIGIN (Place an "X" in One Box Only)

| | | | | | | | Appeal to District Judge from Magistrate Judgment |
|---|---|---|---|---|---|---|---|
| XX 1 Original Proceeding | ☐ 2 Removed from State Court | ☐ 3 Remanded from Appellate Court | ☐ 4 Reinstated or Reopened | ☐ 5 Transferred from another district (specify) | ☐ 6 Multidistrict Litigation | ☐ 7 | |

## VI. CAUSE OF ACTION

Cite the U.S. Civil Statute under which you are filing (Do not cite jurisdictional statutes unless diversity):
31 U.S.C. § 3729 et seq.

Brief description of cause:
False Claims Act case on Kickbacks & Fraud.

## VII. REQUESTED IN COMPLAINT:

☐ CHECK IF THIS IS A CLASS ACTION UNDER F.R.C.P. 23

DEMAND $

CHECK YES only if demanded in complaint:
JURY DEMAND:   X☒ Yes   ☐ No

## VIII. RELATED CASE(S) IF ANY

(See instructions):   JUDGE _____   DOCKET NUMBER _____

DATE
12/18/06

SIGNATURE OF ATTORNEY OF RECORD

**FOR OFFICE USE ONLY**

RECEIPT # _____   AMOUNT _____   APPLYING IFP _____   JUDGE _____   MAG. JUDGE _____